# In the United States Court of Federal Claims

No. 22-429
Filed: August 26, 2022
Re-issued: September 14, 2022[1]

_____
                                                )
LIGHTBOX PARENT, L.P.,                )
                                                )
                          *Plaintiff*,    )
                                                  )
   v.                                                )
                                                  )
THE UNITED STATES,                   )
                                                  )
                          *Defendant*,   )
                                                  )
   and                                         )
                                                  )
COSTQUEST ASSOCIATES, INC.,    )
                                                  )
                     *Defendant-Intervenor*.   )
_____   )

Edward V. Arnold, Seyfarth Shaw LLP, Washington, D.C., for Plaintiff.  Stephanie B. Magnell, Bret C. Marfut, and Joseph J. Dyer, *of counsel*.

Bryan M. Byrd, Trial Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., with whom were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Tara K. Hogan, Assistant Director, for the Defendant. Chin Yoo, Deputy Associate General Counsel, and Kelly Zeng, Attorney Advisor, Federal Communications Commission, *of counsel*.

Anuj Vohra, Crowell & Moring LLP, Washington, D.C., for Defendant-Intervenor.  John E. McCarthy Jr., Cherie J. Owen, William B. O'Reilly, Issac D. Schabes, and Rachel L. Schumacher, *of counsel*.

## OPINION AND ORDER

        This protest challenges the award of a contract to provide a massive data set for the Government to use in determining which structures in the United States can have broadband internet service installed.  Congress has tied more than $40 billion of infrastructure funding to

---

[1] The Court initially filed this opinion under seal to allow the Parties to propose redactions. The Court has incorporated the proposed redactions and makes them with bracketed ellipses ("[ . . . ]") below.

availability maps that the Federal Communications Commission must produce using the data set provided under this contract. LightBox Parent, L.P. challenges the award to CostQuest Associates, Inc., alleging that CostQuest made multiple material misrepresentations in its proposal regarding the terms of a third-party licensing agreement that LightBox is not a party to. Because the Court concludes that CostQuest made no material misrepresentation, the Court denies LightBox's motion for judgment on the administrative record and grants the Government's and CostQuest's motions for judgment on the administrative record.

**I.      Background**

In early 2020, Congress passed the Broadband Deployment Accuracy and Technological Availability Act ("Broadband DATA Act"), 47 U.S.C. § 641 et. seq. ECF No. 24-2 at AR 47. The Act requires the Federal Communications Commission ("FCC") to gather "standardized, granular data" about the availability of "both fixed and mobile broadband Internet access services." *Id*. Using this data, the FCC must then publish coverage maps and allow the public and others (e.g., service providers) "to challenge and verify the coverage maps." *Id*. Finally, the FCC must "create a common dataset of all locations where fixed broadband Internet access service can be installed." *Id*.

A lot is riding on this final dataset. "The 2019 novel coronavirus pandemic has underscored the critical importance of affordable, high-speed broadband for individuals, families, and communities to be able to work, learn, and connect remotely while supporting social distancing." 47 U.S.C. § 1701(5). And the pandemic laid bare the "digital divide"—the lack of broadband Internet access in various communities around the country. *Id*. § 1701(2). To address the continuing need for broadband in underserved areas, in 2021 Congress provided for grants to deploy broadband to these underserved areas. But the critical question is what areas are "underserved"? Here, Congress chose to base most of the grants on the dataset and maps that it directed the FCC to create. Only a small amount of funding would go out until the FCC completed these tasks. *Id*. § 1702(c)(2) (limiting funding for broadband for underserved areas to $100 million per state, plus $100 million to be divided equally among the U.S. Virgin Islands, Guam, American Samoa, and the Northern Mariana Islands). The remaining amount, approximately $42.45 billion, remains unavailable until the FCC completes the dataset and publishes the availability maps. *Id*. § 1702(c)(3)(A). That's a lot of funding.

**A.      The solicitation**

The FCC issued Request for Proposals No. 273FCC21R0005 (the "RFP") to procure the data needed to prepare the broadband availability maps. The RFP sought proposals to provide the Broadband Serviceable Location Fabric (the "Fabric"), which Congress explained was "a common dataset of all locations in the United States where fixed broadband internet access service can be installed, as determined by the [FCC]." ECF No. 24-2 at AR 191 (quoting 47 U.S.C. § 642(b)(1)(A)(i)). A broadband serviceable location ("BSL"), as defined by the FCC, is "a business or residential location in the United States at which fixed broadband Internet access service is, or can be, installed." *Id.* at AR 193. And "the Contractor shall generate a set of data on all of the structures in the United States and determine whether each structure is a BSL or not." *Id.* The Fabric would contain various data about each location called for in the RFP. *See*,

*e.g.*, *id.* at AR 194-95.  Finally, the offerors had to provide a mechanism for corrections to the Fabric from the FCC or other entities with location-specific information.  *Id.* at AR 195.

The RFP explained that the FCC expected a single award to the offer representing the best value to the Government.  In performing the best value determination, the FCC would consider: (1) technical approach; (2) data usage rights; (3) past performance; and (4) price.  *Id.* at AR 260-61.  The RFP provides the following relative importance of each factor:

| Evaluation Factor | Order of Importance |
| --- | --- |
| Factor 1 – Technical Approach | Factor 1 is slightly more important than Factor 2. |
| Factor 2 – Data Usage Rights | Factor 2 is slightly more important than Factor 3. |
| Factor 3 – Past Performance | Factor 3 is slightly less important than Factor 2. |
| Factor 4 – Price | Factors 1-3, when combined, are **significantly more important than price**. |

*Id.* at AR 261 (emphasis in original).

The FCC designed the technical evaluation to allow it to "consider the extent to which the Offeror's technical approach will achieve Broadband Location Serviceable Fabric objectives."  *Id.* at AR 262.  Thus, the RFP required each offeror to provide detailed information about its approach, including the data sources it relies upon, how it analyzes data, how often it refreshes data, how data accuracy may change over time, how it validates data, processes to reduce errors, and how it measures errors.  *Id.* at AR 257-58.  In addition, the RFP called on offerors to describe their experience working with GIS[2] datasets and how quickly they expected to provide an initial Fabric to the FCC, along with "an estimate for the number of total structures, BSLs, and addresses in its initial Fabric dataset."  *Id.*

The data usage rights factor required that every offeror "detail the data deliverables it will provide to the Government and the [d]ata [u]sage [r]ights it proposes to provide the Government in those deliverables."  *Id.* at AR 258.  Because different data rights could impact the offeror's price, the RFP allowed each to "submit up to two (2) alternate Data Usage Rights Proposals and an associated alternate Price Proposal for each Data Usage Rights proposal."  *Id.* at AR 252.  In effect, the FCC allowed offerors to propose up to three different data usage and price proposals for consideration (the technical and past performance proposals would be the same for all).

---

[2] GIS stands for geographic information system and refers to a database of geographic data.

Because bidders may "rely on commercial data sources to which they have limited access rights or may desire to restrict access to datasets to preserve their commercial interests," *id.* at AR 197, the FCC developed a tiered approach to data rights:

- Tier 1: Minimum Required Data Usage Rights, *id.* at AR 198-200 (Statement of Objectives ("SOO") § 3.3.1);

- Tier 2: Preferred Data Usage Rights, *id.* at AR 200 (SOO § 3.3.2); and

- Tier 3: Most-Preferred Data Usage Rights, *id.* at AR 201 (SOO § 3.3.3).

To be acceptable, the FCC required each offeror to provide at least Tier 1 data rights. *Id.* at AR 258. The RFP initially required offerors to provide all license agreements that cover any data they intended to provide to the Government in the Fabric. *Id.* at AR 64. During the Q&A, one potential offeror noted that there could be many such license agreements that may be confidential and asked whether offerors could provide an attestation to their rights or an abstract of their license agreements. *Id.* at AR 133 (Question 19). The FCC agreed to allow an abstract of each agreement and amended the RFP to provide that "[t]o the extent the Offeror propose[d] to provide any data that is subject to existing third-party license agreement(s)," it must provide "a copy of the applicable license agreement(s) . . . or an abstract/summary of any such third-party license agreements with sufficient detail to allow for evaluation of the proposed [d]ata usage [r]ights in its proposal." *Id.* at AR 258.

For past performance, the RFP required offerors to provide three recent contracts, preferably with the federal government, for consideration. *Id.* at AR 259. Among the information to be included is an explanation of how the prior performance is relevant to building national or state-level datasets and whether the work involved broadband datasets. *Id.*

Finally, the RFP required offerors to use a pricing sheet to provide all prices for the RFP, including labor categories, labor rates, and the number of hours to complete each subtask or activity in the SOO, as well as pricing for support and special project Contract Line Item Numbers. *Id.* at AR 260. Offerors had to provide enough information to allow the FCC to determine that their prices were fair and reasonable. *Id.* Again, each offeror could submit up to two alternate data rights proposals, each with its own price proposal.

### B.     The FCC's evaluation and award

The FCC received twelve proposals from seven offerors including two each from LightBox and CostQuest. ECF No. 24-3 at AR 880-81, 883. The competition came down to LightBox's proposal and CostQuest's Alternative Data Usage Rights proposal.[3] *Id.* at AR 909-

---

[3] In Count I of its Complaint, LightBox protests alleged misrepresentations in CostQuest's alternate data usage rights proposal, which won the award. Count II alleged that CostQuest failed to comply with a material requirement and was, therefore, ineligible for award. Count III challenged the FCC's assigning LightBox a weakness that Lightbox alleged was also present in CostQuest's alternate proposal but was not assigned a weakness. In its Response, LightBox abandoned Counts II and III, leaving only the misrepresentation claims in Count I before the Court. ECF No. 39 at 1 n.1. Therefore, the Court provides a limited overview of the evaluation

4

12. The FCC evaluated LightBox's Data Usage Rights proposal and CostQuest's Alternative Data Usage Rights proposal as follows:

| Name of Offeror | Evaluation/Assessment | | | | |
|---|---|---|---|---|---|
| | Technical | | Past Performance | Technical Acceptability | Price |
| | Factor 1 Technical Approach | Factor 2 Data Usage Rights | Factor 3 Past Performance Confidence Level | | |
| CostQuest – Alt. | Good | Fair | Substantial Confidence | Technically Acceptable | $44,921,200 |
| LightBox | Good | Fair | Satisfactory Confidence | Technically Acceptable | $38,700,000 |

*Id.* at AR 883, 885 (excerpted). The FCC determined that only CostQuest's and LightBox's four proposals were technically acceptable. *Id.* at AR 909. Based on an extensive best value comparison, the FCC concluded that CostQuest's Alternative Data Usage Rights proposal was the best value to the Government, even though it was $6,221,200 more expensive than LightBox's primary offer. *Id.* at AR 885, 912-13.

### C. The GAO protest

LightBox unsuccessfully protested the contract awarded at the GAO. *Id.* at AR 985; ECF No. 24-4 at AR 2452-67. Before the GAO, LightBox argued (as relevant to this protest) that CostQuest must have violated a private licensing agreement it had with a third-party, Black Knight. ECF No. 24-4 at AR 1347-55. LightBox has compiled certain data that it licenses to Black Knight. *Id.* at AR 2454. Black Knight has licensed the LightBox data to CostQuest. *Id.* Much of LightBox's argument to the GAO was that LightBox required certain clauses to be in the Black Knight—CostQuest agreement, which LightBox had never seen before, and those provisions prohibited CostQuest from using the data in the way it proposed to with the FCC. *Id.* at AR 2461.

The GAO dismissed these claims "[b]ecause the resolution of the protester's challenges [is] inseparable from a dispute over the terms of a private agreement between private parties," over which the GAO lacked jurisdiction. *Id.* at AR 2463. For reasons that are not apparent, LightBox did not file its protest in this Court for seven weeks after the GAO issued its decision. *See id.* at AR 2452 (GAO decision dated February 24, 2022); ECF No. 1 at 39 (Complaint dated April 12, 2022).

---

for context but does not go into detail because the misrepresentation claims do not implicate the FCC's evaluation of the proposals.

5

## II. Motions to Dismiss

### A. Standards of review

When deciding a motion to dismiss for lack of jurisdiction under RCFC 12(b)(1), the Court considers all undisputed facts alleged in the plaintiff's complaint as true and draws all reasonable inferences in the non-movant's favor. *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016) (quoting *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011)). The Court may consider not only "the allegations in the complaint, [but] may also look to 'matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record.'" *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1147 (Fed. Cir. 2014) (quoting 5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004)). LightBox bears the burden of establishing by a preponderance of the evidence that the Court has jurisdiction. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). Should the Court determine that "it lacks jurisdiction over the subject-matter, it must dismiss the claim." *Matthews v. United States*, 72 Fed. Cl. 274, 278 (2006) (citations omitted); *see also* RCFC 12(h)(3) (requiring the court dismiss cases which lack subject matter jurisdiction).

"A motion to dismiss . . . for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the plaintiff do not entitle him to a legal remedy." *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006) (quoting *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed. Cir. 2000)). As the Supreme Court explained, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). And to be plausible on its face, it "does not need detailed factual allegations." *Twombly*, 550 U.S. at 555; *see also Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009) (Rule 8 "does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face.") (citation omitted). In other words, the complaint must contain enough detail "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted). "Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed. Cir. 1998) (citations omitted). Nevertheless, the Court "must assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant." *United Pac. Ins. Co.*, 464 F.3d at 1327-28 (quoting *Anaheim Gardens v. United States*, 444 F.3d 1309, 1314-15 (Fed. Cir. 2006)).

### B. Motions to dismiss are denied

The Government and CostQuest move for dismissal under both RCFC 12(b)(1) and 12(b)(6) because they contend that resolution of this case requires the Court to decide a private dispute that is beyond this Court's jurisdiction. *E.g., Delmarva Power & Light Co. v. United States*, 79 Fed. Cl. 205, 213 (2007), *aff'd*, 542 F.3d 889 (Fed. Cir. 2008) (citing *United States v. Sherwood*, 312 U.S. 584, 588-89 (1941)). They contend that determining whether CostQuest misrepresented the terms of its license agreement would require the Court to decide the merits of a private dispute and determine the parties' respective rights under a private contract. ECF No. 33 at 20; *see also* ECF No. 34 at 24 ("LightBox's claim that CostQuest breached the terms of its licensing agreement with Black Knight [is] outside of this Court's jurisdiction . . . ."). They

further contend that even if the Court has jurisdiction, it cannot grant relief because the relief for any breach of the CostQuest-Black Knight license agreement would necessarily flow to Black Knight, which is not a party to this action. LightBox sees things differently; it views this as simply a run-of-the-mill bid protest challenging the award of a federal contract that fits comfortably within this Court's jurisdiction, as does the relief sought—an injunction setting aside the contract award. ECF No. 26 at 19-20.

This is not a case that will require the resolution of a private dispute or the allocation of rights under a private contract. The Court must only resolve a challenge to a federal contract award, which this Court does routinely under the Tucker Act. Unlike the argument before the GAO, LightBox is *not* asserting a breach of the CostQuest-Black Knight agreement here. ECF No. 39 at 3; ECF No. 44 at 28:1-21. Rather, LightBox insists that it is not necessary for the Court to determine whether the data use CostQuest proposed to grant the FCC is inconsistent with the terms of the CostQuest-Black Knight agreement. ECF No. 39 at 3. While LightBox's Complaint will require the Court to evaluate whether CostQuest misrepresented the terms of its agreement with Black Knight, the Court need not definitively interpret that agreement to do so. Almost all of LightBox's arguments require only a determination of whether CostQuest's proposal contemplates doing anything that could possibly implicate certain provisions of its agreement with Black Knight rather than a definitive interpretation of the private contract. As the Government conceded in oral argument, "[t]o the extent the Court does not need to interpret the underlying license agreement and therefore interpret the private rights of private parties, the Court, we believe, would have the ability to adjudicate the claim . . . ." ECF No. 44 at 22: 19-23.

And it cannot be overstated that the *only* reason that the Black Knight-CostQuest license agreement is relevant to this protest at all is because the FCC made it so. ECF No. 24-2 at AR 258. Neither the Government nor CostQuest provide a convincing argument that the FCC can ask for information in an RFP but the response is immune from review as to whether it is a misrepresentation. And if there were such a misrepresentation, the relief is not to Black Knight, but an injunction against the Government setting aside the contract award to CostQuest. Therefore, the Court denies the Government's and CostQuest's motions to dismiss.

### III. Motion for Judgment on the Administrative Record

LightBox alleges CostQuest made multiple material misrepresentations in its proposal regarding its license agreement with Black Knight. These misrepresentation arguments fall into three categories. First, LightBox alleges that CostQuest misrepresented the rights available under the Black Knight license agreement by omitting certain provisos. Second, LightBox alleges that CostQuest misrepresented its rights to tax assessor data. Finally, LightBox alleges misrepresentations regarding parcel boundary data. The Court addresses each category of alleged misrepresentations in turn.

#### A. Standard of review

A motion for judgment on the administrative record ("MJAR") under RCFC 52.1 provides an expedited "trial on a paper record, allowing fact-finding" by the Court. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). RCFC 52.1 requires the Court "to make factual findings from the record evidence as if it were conducting a trial on the record." *Id.*

at 1354.  Unlike a motion for summary judgment, the Court may grant judgment when there is a genuine dispute of material fact, which the Court resolves based on the record.  *Id.* at 1355-56.

Pursuant to the Tucker Act, this Court reviews the Government's action under the standards of the Administrative Procedure Act ("APA").  28 U.S.C. § 1491(b)(4); *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Under the APA, the Court determines whether the Government's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *Banknote*, 365 F.3d at 1350 (citation omitted).  In other words, "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Banknote*, 365 F.3d at 1351 (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).

The APA also requires that "due account shall be taken of the rule of prejudicial error."  5 U.S.C. § 706; *see also Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (citations omitted) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.").  To establish prejudice, a protester must demonstrate "there was a substantial chance it would have received the contract award but for the" challenged action.  *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 912 (Fed. Cir. 2013) (citing *Bannum, Inc.*, 404 F.3d at 1358).  The extent of prejudice a protestor must show depends on the alleged error.  "[W]hen an irrational or arbitrary and capricious agency action has occurred, prejudice is presumed, but when a violation of statute or regulation has occurred, there must be a separate showing of prejudice."  *Caddell Constr. Co. v. United States*, 125 Fed. Cl. 30, 50 (2016) (citing *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)); *Banknote*, 365 F.3d at 1351; *see also, e.g., Textron, Inc. v. United States*, 74 Fed. Cl. 277, 329 (2006) ("This prejudice analysis, however, should be reached only when the protestor has shown violation of an applicable procurement regulation. If the court finds that the Government has acted arbitrarily and capriciously, the analysis stops at that finding."), *appeal dismissed sub nom. Textron, Inc. v. Ocean Tech. Servs., Inc.*, 222 F. App'x 996 (Fed. Cir. 2007), *and dismissed per stipulation*, 223 F. App'x 974 (Fed. Cir. 2007).

Allegations of material misrepresentation can be the basis for a bid protest.  *Plan. Rsch. Corp. v. United States*, 971 F.2d 736, 740-41 (Fed. Cir. 1992) ("[T]he misrepresentations of [the contractor], together with the 'massive' personnel substitutions made by [the contractor] after award with the acquiescence and assistance of [the agency], tainted the bidding and evaluation process.").  And this Court has followed the Federal Circuit's precedent in bid protests as well.  *See, e.g.*, *Optimization Consulting, Inc. v. United States*, 115 Fed. Cl. 78, 99 (2013) ("[T]he submission of a misstatement, as made in the instant procurement, which materially influences consideration of a proposal should disqualify the proposal.") (quoting *Plan. Rsch. Corp.*, 971 F.2d at 741) (alteration in original); *Blue & Gold Fleet, L.P. v. United States*, 70 Fed. Cl. 487, 495 (2006), *aff'd*, 492 F.3d 1308 (Fed. Cir. 2007) ("To preserve the integrity of the solicitation process when such a material misrepresentation influences the award of the proposal, the proposal is disqualified from consideration.").

**B.    Count IA—CostQuest's summary of third-party data rights relating to Black Knight's tax assessor data**

According to LightBox, CostQuest materially misrepresented its agreement with Black Knight, thereby preventing the FCC from being able to review the terms of LightBox's agreement with Black Knight.  ECF No. 30 at 18-23; ECF No. 26 at 21.  The RFP initially required offerors to include each third-party license covering data the offeror proposed to provide to the FCC.  During the Q&A, one offeror asked whether offerors could simply attest to their rights because many third-party agreements are voluminous and confidential.  ECF No. 24-2 at AR 133 (Question 19).  The FCC declined to allow an attestation but did amend the RFP to allow a summary of data rights.  *Id.* at AR 258.  To be compliant, the offeror had to provide "sufficient detail to allow for evaluation of the proposed [d]ata usage [r]ights in its proposal."  *Id.* (emphasis added).  LightBox asserts that this requirement had a "substantive purpose: to permit the Agency itself to evaluate the terms of third-party license agreements in the context of the proposals."  ECF No. 26 at 21.  And LightBox alleges that "CostQuest never gave the FCC the opportunity to do so.  CostQuest failed to comply with a material solicitation requirement and deprived the Agency of the right to evaluate the impact of these terms."  *Id.*

It is somewhat unclear whether LightBox is arguing that the FCC had to be able to review the actual terms of third-party agreements or just a summary.  As a result, both the Government and CostQuest raise *Blue & Gold* arguments.  ECF No. 33 at 24; ECF No. 34 at 39.  To the extent LightBox is arguing that the FCC had the right to review the actual agreements, that argument is waived under *Blue & Gold*.  But that does not end the inquiry because one can also read LightBox's argument to say that CostQuest's summary of its Black Knight agreement was so deficient that it prevented the FCC from evaluating the limitations that it did not know about.[4]  The Court will evaluate LightBox's argument based on this understanding.

LightBox's final argument is that CostQuest misrepresented its Black Knight license agreement because its summary of the agreements indicates that there are no other restrictions in the agreement beyond those summarized.  CostQuest's summary of its third-party license agreements is presented in Table 3 of its proposal.  ECF No. 24-2 at AR 396-97.  The relevant portion of Table 3 is:

[ . . . ].

*Id.* at AR 396.

---

[4] While the Court may not agree with CostQuest's assertion that LightBox's arguments about the sufficiency of CostQuest's summary is the "height of hypocrisy," CostQuest is correct that LightBox provided far less information about its third-party licenses than CostQuest did.  ECF No. 34 at 39.  LightBox may not protest now based on an interpretation of the RFP it did not adhere to while preparing its proposal.  *Id.*; *see also NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1162 (Fed. Cir. 2004).  This is not a basis to reject the protest here, however, because LightBox's argument is not that CostQuest's license summary is facially deficient (an argument it would lose based on its proposal), but that CostQuest made material misrepresentations that tainted the FCC's review.

The Parties argue at length about whether the "No" that CostQuest put in the "restrictions" column meant that there were no other restrictions at all, or that there were no other restrictions that could impact the data usage rights that CostQuest proposed to give the FCC.  According to LightBox, the "No" meant that CostQuest affirmatively represented to the FCC that it had "no other use restrictions on the Parcel Boundary Data relevant to either the creation of the Fabric or the Data Usage Rights terms."  ECF No. 39 at 28.  LightBox insists this is a misrepresentation because of other limitations[5] in the Black Knight agreement.  But the Government and CostQuest contend that the "'No' in the 'Restrictions' column more naturally means that there were no restrictions in the license agreement that rendered CostQuest unable to deliver the Fabric with its proposed data usage rights."  ECF No. 33 at 27; ECF No. 34 at 33-34.  The RFP makes the resolution of this dispute much easier than the parties let on.

They dispute whether the Court can consider the supplemental declaration of the FCC's Technical Evaluation Team ("TET") Chair regarding the FCC's understanding of the "No" during the evaluation.  ECF No. 39 at 6-7; ECF No. 40 at 8.  The TET Chair provided his declaration to the GAO and explained that he and the TET understood Table 3 to state only that no other restrictions impacted CostQuest's ability to provide the Fabric.  ECF No. 24-4 at AR 2203-04 (Rosenberg Suppl. Decl. ¶ 11).  But the Court need not wade into that dispute because it need not resort to the TET Chair's declaration to resolve this issue.  The RFP required CostQuest to provide a summary of the Black Knight Agreement "with sufficient detail to allow for evaluation of the proposed Data usage Rights in its proposal."  ECF No. 24-2 at AR 258.  Given that the RFP called for a summary of third-party data rights sufficient to allow the FCC to determine if CostQuest would be able to provide the data usage rights that it proposed to give the FCC, the "No" is best understood to mean that there were no other restrictions that would impact the FCC's use of the Fabric with the rights CostQuest proposed.  The Court declines to read CostQuest's proposal without reference to the RFP that it was responding to.

### C. Count I.B—Tax Assessor Data

LightBox alleges various misrepresentations regarding CostQuest's rights in the Tax Assessor Data.  First, LightBox contends that CostQuest omitted three limitations of its agreement with Black Knight, which were material misrepresentations.  Second, LightBox argues that CostQuest omitted the "internal business use only" restriction relevant to Black Knight Tax Assessor Data.

#### 1. Black Knight limiting provisos

This category of alleged misrepresentations concerns CostQuest's omission of three restrictive provisos in paragraph 4.1.2 of the Black Knight agreement that imposed specific limitations on CostQuest's ability to use or manipulate the Black Knight data.  ECF No. 24-4 at AR 2146.  CostQuest and the Government contend that the provisos are either incorporated into the license CostQuest proposed to provide the Government or irrelevant to CostQuest's proposal.  The Court addresses each in turn.

---

[5] These additional limitations are addressed in detail below.

*a)     Proviso 1—No reverse engineering*

The first proviso ("Proviso 1") of the Black Knight-CostQuest license agreement states that "any Permitted User using the [Fabric] will be unable to reverse engineer or otherwise recreate the [Tax Assessor Data] or any products and services that serve the same purpose as and are substantially similar to the [Tax Assessor Data]." *Id.* LightBox contends that CostQuest omitted this limitation from its summary of its license agreement with Black Knight. CostQuest admits that its summary of its Black Knight agreement does not specifically identify this limitation on reverse engineering. ECF No. 39 at 24-25.

CostQuest and the Government contend that the omission is not a material misrepresentation because CostQuest's proposed license to the FCC explicitly prohibits reverse engineering of all data, not just the tax assessor data. ECF No. 33 at 10, 33; ECF No. 34 at 29; *see also* ECF No. 24-2 at AR 392 ("General Use Restriction" (vi)). The GAO considered this argument and concluded that "because the record reflects that CostQuest's proposal included the allegedly omitted provision, CostQuest's proposal was not materially misleading with regard to that provision, and the protester's arguments about this provision are denied." ECF No. 24-4 at AR 2462. The Court agrees. CostQuest's proposed license provides that permitted users, including the FCC, "shall not at any time, directly or indirectly . . . (vi) reverse engineer, disassemble, decompile, decode, adapt, or otherwise attempt to derive or gain access to the source of the [Fabric] or methods used to compile the [Fabric], in whole or in part." ECF No. 24-2 at AR 392. This language clearly encompasses the Proviso 1 limitation that the FCC could not reverse engineer the Black Knight data. LightBox argues that the Court should reject all counter arguments because they are "misdirection" and "heat-of-litigation arguments" that the Court often ignores. ECF No. 39 at 23-24. Not so. CostQuest and the Government are allowed to argue that CostQuest's proposal either did not misrepresent something or that misrepresentations were not material. LightBox cannot get off so easily.

LightBox does not read CostQuest's proposed license to prohibit reverse engineering because the prohibition is subject to a caveat that the prohibition applies "except as otherwise expressly set forth in this Agreement." *Id.* at 24 (quoting ECF No. 24-2 at AR 392). And LightBox insists that CostQuest's proposal allows the FCC the "'*[u]nlimited* rights to . . . use . . . modify . . . [and] prepare a Derivative' as necessary to accomplish the goals of the Broadband Data Collection." *Id.* at 24 (quoting ECF No. 24-2 at AR 392-93) (emphasis and alterations in original). According to LightBox, this *could* allow reverse engineering. ECF No. 44 at 47:21-48:2. This myopic argument fails.

First, CostQuest's proposal provides that the prohibition on reverse engineering applies unless another provision *expressly* allows it. Nothing LightBox points to expressly allows reverse engineering. Indeed, LightBox merely says that derivatives "could" include reverse engineering. On its face, this is not expressly allowing reverse engineering. Second, CostQuest's proposal provides a clear and expansive definition of a "derivative" that the FCC has unlimited rights to create. ECF No. 24-2 at AR 392. Nothing in CostQuest's definition of "derivative" comes close to "reverse engineering," which Proviso 1 clearly defines as attempting to "recreate" the Black Knight tax assessor data. ECF No. 24-4 at AR 2146.

11

During oral argument, LightBox relied heavily on its omission argument—that the FCC could not evaluate the Black Knight agreement's prohibition on reverse engineering. *See* ECF No. 44 at 45:19-21. That is not material here. CostQuest clearly included a prohibition on reverse engineering in its proposed license to the FCC. As a result, the FCC was clearly on notice that it would not be permitted to reverse engineer anything in CostQuest's Fabric. LightBox has not pointed to any reason why the FCC had to know this prohibition was also a requirement of the Black Knight agreement. Put simply, whether the prohibition on reverse engineering comes from the Black Knight agreement or something CostQuest dreamed up on its own is of no moment to the FCC's analysis of whether it would be able to use the Fabric with the data use rights that CostQuest proposed.

Finally, LightBox claims that Proviso 1 is incompatible with the RFP's Tier 1: Minimum Required Data Usage Rights, which requires the right to create derivative works. ECF No. 26 at 24.[6] The RFP requires the unlimited right to create derivatives, which it defines as "maps, reports of location-weighted broadband availability by geography, sample frames for auditing, or additional quality reports." ECF No. 24-2 at AR 198. This is not reverse engineering. Nor does LightBox carry its burden of showing that this implicates in any way Proviso 1's prohibition on "recreat[ing] the [Tax Assessor Data] or any products and services that serve the same purpose as and are substantially similar to the [Tax Assessor Data]." ECF No. 24-4 at AR 2146.

### b) *Proviso 2–data solely from tax assessor data must be specifically licensed*

The second proviso ("Proviso 2") of the Black Knight-CostQuest license agreement that LightBox complains of states that "any field in [the Fabric] solely sourced from the [Tax Assessor Data] must be either licensed directly from Black Knight by the Permitted User or separately agreed to and approved by Black Knight for inclusion in [the Fabric]." *Id.* CostQuest argues that it "did not propose, or intend, to source any data *solely* from Black Knight." ECF No. 41 at 18 (emphasis added). The Government makes the same argument. ECF No. 40 at 21-22. The important question, of course, is what CostQuest's proposal states.

CostQuest's proposal does not state that it would rely *solely* on the Black Knight data for anything. According to LightBox, because "CostQuest identifie[d] the Black Knight Tax Assessor Data as the 'primary source' of the Fabric's 'address' field, [it] indicat[es] that [the] Fabric *would* include data sourced solely from Black Knight." ECF 39 at 25 (citing ECF No. 24-2 at AR 396) (emphasis in original). Thus, LightBox argues that "CostQuest's and the Agency's broad claim that the second proviso of section 4.1.2 is immaterial to CostQuest's proposal finds no support in that proposal[']s language." *Id.* But LightBox's argument relies on an inferential leap that is not only unsupported by the record, it is contradicted by CostQuest's actual proposal.

The very same table summarizing CostQuest's third-party licensing agreements that LightBox insists states that Black Knight Tax Assessor Data would be the "sole" source of address data lists [ . . . ] other sources of address data that CostQuest intended to use. ECF No. 24-2 at AR 396-97. While LightBox states that CostQuest did not propose to use this data, their

---

[6] It is not clear that this is a misrepresentation argument, and LightBox abandoned all but its misrepresentation claims. ECF No. 39 at 1 n.1.

inclusion in the third-party data rights summary indicates clearly that CostQuest intended to use it. In fact, CostQuest identified additional license agreements covering data it intended to provide in the Fabric. Why would CostQuest agree to terms with another data provider, [ . . . ], and have the agreement in place prior to performance if it did not intend to use that data in the Fabric? *See id.* at AR 397. LightBox cannot have it both ways. It cannot argue that the inclusion of Black Knight as a source of address data equals a proposal to "use" that data but the inclusion of [ . . . ] other sources of data and related license terms in the same summary of third-party data is not a proposal to "use" that data.

In fact, LightBox concedes that nothing in CostQuest's proposal indicates that it planned to provide a field sourced solely from the tax assessor data. ECF No. 44 at 54:7-10. And CostQuest's proposal is abundantly clear that [ . . . ]. To the contrary, CostQuest's proposal is overflowing with statements about how CostQuest would [ . . . ]. For example, CostQuest explains that [ . . . ]. ECF No. 24-2 at AR 355. Similarly, CostQuest's proposal states that it would use [ . . . ] and that because [ . . . ]. *Id.* at AR 357, 360. As the Government argues, "[i]t strains credulity to think that the Tax Assessor Data ever would be the sole source" of address (or any other) fields in CostQuest's Fabric. ECF No. 40 at 21.

Because CostQuest does not propose to source any data field in its Fabric solely to Black Knight Tax Assessor Data, Proviso 2 is simply irrelevant. The FCC did not require a summary of all third-party license terms, only a summary "with sufficient detail to allow for evaluation of the proposed Data usage Rights in [a] proposal." ECF No. 24-2 at AR 258. Because nothing in CostQuest's proposal implicates Proviso 2, it necessarily does not impact the proposed data usage rights that CostQuest proposed to provide to the FCC, and its omission from CostQuest's summary of its Black Knight license agreement complies with the RFP's requirements and is not a material misrepresentation.

                *c)*        *Proviso 3–identification of Black Knight as the source of data*

The third proviso ("Proviso 3") of the license agreement states that: "any data derived from the [Tax Assessor Data], in any field provided in [the Fabric] by Client to any Permitted User, shall not be identified as being sourced from the [Tax Assessor Data]." ECF No. 24-4 at AR 2146-47; ECF No. 44 at 103: 16-18. LightBox contends that the RFP's requirement to allow the FCC to publish metadata is plainly implicated by this limitation. ECF No. 26 at 25. LightBox's argument fails for much the same reason as its argument regarding Proviso 2— CostQuest neither proposes to identify Black Knight's Tax Assessor Data as the source of any field in the Fabric, nor does the RFP require it to do so.

It is not disputed that "solicitations should be read as a harmonized whole." *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1344 (Fed. Cir. 2021) (citing *Banknote*, 365 F.3d at 1353 n.4). This is particularly true for understanding the solicitation's requirement that the FCC be allowed "to publish metadata (information about data such as content, format, source, [and] rights . . . .)". ECF No. 24-2 at AR 198. If the RFP stopped there, LightBox could have a point (if the FCC intended to publish metadata about each field in CostQuest's Fabric). But the RFP doesn't stop there; it also provides that the FCC's right to publish metadata will be "consistent with the requirements of the Foundations for Evidence Based Policymaking Act, and

the National Spatial Data Infrastructure." *Id.* (citing 44 U.S.C. § 3511(c) & 43 U.S.C. § 2804). To understand the RFP requirement, one must look to these two acts.

44 U.S.C. § 3511 mandates the creation and maintenance of a federal data catalogue of "data assets" within the federal government. A "data asset" is defined as "a collection of data elements or data sets that may be grouped together." 44 U.S.C. § 3502(17). And 43 U.S.C. § 2804(b)(1)(D) requires the Government to "ensure . . . the protection of proprietary interests related to licensed information and data." When read with these statutes in mind, the RFP does not require the right to publish metadata about each field, it requires the FCC to have the right to publish metadata to comply with these statutory commands.

And nothing in those statutes requires the publication of metadata about specific fields in the Fabric. To the contrary, the statutes call on the FCC to provide metadata, including source metadata, for the "data asset." 44 U.S.C. § 3511. Recall that the "data asset" is the collection of data, not any individual piece of data in the collection. Proviso 3, however, is limited to the identification of Black Knight data as the source of the data in a specific field in the Fabric. Finally, the RFP also identifies that the type of metadata the FCC requires the right to publish is that used on data.gov. ECF No. 24-2 at AR 198. Looking at the FCC's datasets on data.gov confirms that there is no metadata for anything other than the entire data set, *i.e.*, data asset (in this case, the Fabric). *See* https://catalog.data.gov/organization/fcc-gov.[7]

LightBox complains that this reading of the RFP is impermissible because it would render the explicit grant of the right to publish "source data" a nullity. ECF No. 39 at 26-27. Not so. The RFP's discussion of the right to publish metadata is contained in one sentence. That sentence *includes* the limiting clause regarding the two statutory provisions and lists data.gov as an exemplar website such metadata could be published on. In other words, reading the statutory references as limiting the scope of the right to publish metadata does not render the right a nullity. Rather, it gives meaning to the entire sentence, which includes limits on the scope of the right to publish metadata. And the Court is not aware of any method of interpretation that allows it to stop reading the RFP mid-sentence as LightBox insists.

Because CostQuest does not propose to allow the FCC the right to publish source data regarding each field in the fabric, nor was it required to, LightBox's Proviso 3 argument fails.

---

[7] When deciding a protest alleging a misrepresentation, "generally 'publicly available documents' may be 'freely cited' even without being included in the administrative record." *Connected Glob. Sols., LLC v. United States*, 160 Fed. Cl. 420, 424 (2022) (citing *Harkcon, Inc. v. United States,* 132 Fed. Cl. 697, 701 (2017)). As Judge Tapp explained, "[b]ecause courts must supplement the administrative record only out of necessity, it would be inappropriate to include publicly available documents. The Court may take judicial notice of those documents, but notice must be consistent with the provisions of FRE 201." *Id.* at 425 (citing *Confidential Informant 59-05071 v. United States*, 134 Fed. Cl. 698, 711 (2017), *aff'd*, 745 Fed. Appx. 166 (Fed. Cir. 2018)). "The Federal Circuit has held that whether to take judicial notice is a matter of discretion for the Court." *Id.* (citing *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1367 (Fed. Cir. 2014)). Therefore, the Court takes judicial notice of the information publicly available about the datasets on data.gov pursuant to FRE 201(b).

2.      Internal business use restriction

LightBox alleges that CostQuest made a material misrepresentation in its proposal when it omitted the "internal business use only" restriction relevant to Black Knight Tax Assessor Data.  ECF No. 26 at 23-24; ECF No. 30 ¶¶ 96-99.  Section 4.2 provides: "Permitted Users shall use [the Fabric] for internal business use only.  Permitted Users shall not resell, relicense or redistribute the Products and Services in whole or in part.  [CostQuest] shall remain fully responsible for Permitted Users' use of the Products and Services provided under this Addendum."  ECF No. 24-4 at AR 2147.  LightBox argues that "[b]ecause section 4.2 limited the sublicense CostQuest could grant to the sublicensee's (the FCC's and other Permitted Users') *internal* business use, CostQuest could not offer the FCC a sublicense to publish the Fabric data, as required to propose Tier 1 Data Usage Rights."  ECF No. 26 at 23 (citing ECF No. 24-2 at AR 198) (emphasis in original).  There are, however, several problems with LightBox's argument.

*First*, like with Proviso 1, CostQuest *did* include the internal use restriction in its proposed license for the FCC and for all other users.  LightBox contends that it "is just not accurate" for CostQuest to argue that it included the internal business use restriction in its proposal because "while CostQuest's General Use Restrictions mention 'internal business operations,' the licenses CostQuest proposed to grant do not mention any restriction to internal business use."  ECF No. 39 at 18 n.15.  LightBox is not correct.  CostQuest proposed to grant the FCC a license "for internal use."  ECF No. 24-2 at AR 393.  Similar restrictions are present in the proposed licenses for other government agencies and other users.  *Id*. at 394-95.  Again, there is no apparent reason, and LightBox points to none, that it would make a difference if the FCC knew whether the internal use restriction came from the Black Knight agreement or CostQuest came up with it on its own.

*Second*, as the Government and CostQuest argue, the RFP does not require the FCC to be able to publish the Fabric.  Rather, the RFP requires the FCC to be able to publish derivatives of the Fabric—"aggregate/derivative data," "data via an online map, or in reports or other static formats," "relevant fields . . . about BSLs for a subset of locations," and "metadata," ECF No. 24-2 at AR 198—not the Fabric itself.  To address this, LightBox argues that the Black Knight license agreement makes no distinction between the Fabric and derivatives.  ECF No. 39 at 19.  But this is nothing more than another way of saying that the Black Knight agreement does not address derivatives of the Fabric.  In the end, LightBox is attempting to *add* a restriction to the Black Knight agreement that it does not plainly contain.  On its face the Black Knight agreement imposes the internal use restriction (which is undefined in the agreement) to the CostQuest Work Product, which is defined as the Fabric and nothing else.  Specifically, the Black Knight agreement defines the "CostQuest Work Product" as "a work product which transforms the [Tax Assessor Data] and the data and products provided by third parties into an original data set selected, compiled, arranged, coordinated and customized by [CostQuest] ('[the Fabric]') to meet the needs of [CostQuest's] customers and licensees, including, without limitation, the [FCC]."  ECF No. 24-4 at AR 2146.  Therefore, the internal business use provision in the Black Knight agreement states that "Permitted Users shall use the *CostQuest Work Product* for internal business use only."  *Id*. (emphasis added).  The Court is unwilling to add a restriction to the Black Knight agreement that it does not itself contain.  Because the internal use limitation applies only to the Fabric and not the derivatives, the omission is not material.

15

Nor does the internal business use limitation prevent CostQuest from proposing preferred publication rights that allow the FCC to publish the Fabric to other licensed users, which are subject to the same licensing restrictions as the FCC. LightBox contends that "[a] Tier 2 sublicense to the FCC to 'publish or otherwise make publicly available' the Fabric data is not valid under the 'internal business use' restriction for both the FCC and Filers." ECF No. 26 at 26 (citations omitted). While the Government acknowledges that "the preferred data publication rights that CostQuest proposed for the FCC pertains to the Fabric itself" it nevertheless asserts that the internal business use restriction does not limit the ability of CostQuest to provide Tier 2: Preferred Data Usage Rights. ECF No. 33 at 31. This begs the question: what preferred data publication rights did the RFP call for and CostQuest propose? The RFP called for, and CostQuest's proposal permitted, the FCC "to provide the Data or to publish or otherwise make publicly available the data on [the FCC's] website, for download, or via API access, *subject to an end-user license*." ECF No. 24-2 at AR 393 (emphasis added). And CostQuest made this clear in its offer by requiring that "[a]ny entity must sign a separate license agreement and be approved by [CostQuest] before Data can be provided." *Id*.

Three definitions within the Black Knight-CostQuest license agreement—"End User," "Permitted Uses," and "Permitted Users"—are important. These definitions explain the scope of the internal business use restriction. An "End User means a third party individual or entity who is authorized in the Permitted Uses . . . to use the Products and Services or [CostQuest's] products that incorporate or rely on the Products and Services set forth in such Addendum for its own internal purposes, and not for resale or redistribution." ECF No. 24-4 at AR 2085. Not surprisingly, the "Permitted Uses" are "the authorized use of the Products and Services as set forth in the applicable Addendum." *Id*. As separate licensees, each entity the FCC might share the Fabric with are individually permitted to use the Fabric for their internal uses. *Id*. Thus, CostQuest effectively is giving the FCC the ability to facilitate third party access to the Fabric data, but only to those that are Permitted Users. ECF No. 24-2 at AR 200 ("The FCC license shall . . . [be] subject to an end-user license."); ECF No. 24-4 at AR 2085 ("Permitted Users means . . . End Users" and an "End User means a third party individual or entity who is authorized"). But CostQuest made clear in its proposal that the Permitted Users could not transmit the Fabric back to the FCC, they could only transmit derivatives of the Fabric (namely broadband availability data and corrections to the Fabric). *See* ECF No. 24-2 at AR 393-94.

*Finally*, the Black Knight agreement is somewhat ambiguous. While it states that CostQuest may only allow internal use of the Fabric, it also provides that "[CostQuest] shall own and hold all rights, title and interest in and to [the Fabric] . . . notwithstanding that portions of [the Fabric] may be derived in whole or in part from the [Tax Assessor Data] . . . . No right or license to [the Fabric] is granted to Black Knight." ECF No. 24-4 at AR 2147. CostQuest contends that the internal business use restriction was included erroneously and was not intended to be included in the Black Knight agreement. ECF No. 34 at 32. According to CostQuest, when read in conjunction with provisions specifying limitations on the use of Black Knight data and giving CostQuest all rights to the Fabric, the only plausible reading is that the internal business use restriction places a limitation only on data Black Knight licensed to CostQuest. *Id*. at 13. LightBox believes that "[b]y conceding that section 4.2 is in tension with section 4.1.5, CostQuest effectively concedes that it made a material misrepresentation." ECF No. 39 at 17. Not so. Given the resolution of the omission of the internal business use limitation above, whether the limitation was included in error does not impact the Court's opinion.

16

### D. Count I.C—Parcel Boundary Data

LightBox claims that "CostQuest affirmatively misrepresented the terms of the License Agreement that apply to the Parcel Boundary Data." ECF No. 26 at 26. To support this assertion, LightBox points to CostQuest's proposal at Table 3 where CostQuest states that for "(2) BlackKnight /Digimap Parcel Boundaries . . . Tax Assessor Data terms (in #1 above [(1) BlackKnight / Tax Assessor Data]) also applies to this information." ECF No. 24-2 at AR 396. Section 4.1.2 of the Black Knight-CostQuest license agreement states that "[CostQuest] may use the [Tax Assessor Data] commingled with data and information from other sources to create [the Fabric]." ECF No. 24-4 at AR 2146. LightBox argues that section 4.1.2 expressly excludes the use of Parcel Boundary Data in the same manner as the Tax Assessor Data and that "CostQuest proposed to use the Parcel Boundary Data in exactly that way." ECF No. 26 at 26 (citing ECF No. 24-2 at AR 362-63).

The Court need not wade into this dispute because the RFP only required license information about data that CostQuest intended to provide in the Fabric. ECF No. 24-2 at AR 258 ("The Offeror shall describe in detail the data deliverables it will provide to the Government and the Data Usage Rights it proposes to provide the Government in those deliverables."). CostQuest has been unequivocal: Black Knight Parcel Boundary Data does not pass into the Fabric. Rather, "[i]ts attributes to [sic] not pass into the fabric. Controls processing, acts as geometric boundary for assessment information." *Id.* at AR 396. The Government has repeatedly compared "data about parcel boundaries, such as the Parcel Boundary Data" to being "like a measuring cup, used to help measure the ingredients, but not part of the final product." ECF No. 33 at 37 (citing ECF No. 24-4 at AR 2176). LightBox argues something slightly different, that "there's no measuring cup here. These are ingredients. These are data input." ECF No. 44 at 68: 6-8. And when asked whether anything in the record shows that Black Knight Parcel Boundary Data passes into the Fabric, LightBox's counsel did not point to anything. *Id.* at 68: 13-25, 69: 1-5. This is dispositive of LightBox's claim "[b]ecause no such requirement existed, [CostQuest] did not make material misrepresentations." *Phoenix Management, Inc. v. United States*, 107 Fed. Cl. 58, 70 (2012), *aff'd*, 516 F. App'x 927 (Fed. Cir. 2013). If the RFP did not ask for certain information, it cannot be material.

LightBox counters that the FCC "awarded CostQuest three strengths under the Data Usage Rights factor—including one for proposing Tier 2 rights, and one for summarizing its data sources—again without knowing that the License Agreement gave CostQuest no right to comingle the Parcel Boundary Data with other data sources." ECF No. 26 at 28 (citing ECF No. 24-2 at AR 806-07). Because the Court has found no merit in LightBox's arguments about CostQuest's proposal, those arguments provide no basis to challenge strengths the FCC found in CostQuest's proposal.

### IV. Injunctive Relief

An injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curium) (citation omitted) (emphasis in original). The Court has

discretion as to whether to grant an injunction and considers the following when evaluating whether to grant permanent injunctive relief:

> (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citation omitted).

LightBox's failure to succeed on the merits is fatal to its motion for an injunction. *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 (Fed. Cir. 2018) ("Because proving success on the merits is a necessary element for a permanent injunction, we reverse the Court of Federal Claims' grant of an injunction."); *see also Acad. Facilities Mgmt. v. United States*, 87 Fed. Cl. 441, 473 (2009) (collecting cases). Indeed, "absent success on the merits, the other [injunctive relief] factors are irrelevant" because "to obtain a permanent injunction [LightBox] 'must show actual success on the merits.'" *D&J Enterprises, Inc. v. United States*, 159 Fed. Cl. 808, 823 (2022) (internal citations omitted). Because LightBox has failed to succeed on the merits, it cannot be granted permanent injunctive relief.[8]

## V.   Conclusion

For the reasons stated above, the Court hereby:

---

[8] Even if LightBox had prevailed on the merits, the Court would still decline to issue an injunction. *PGBA,* 389 F.3d at 1226 ("We thus hold that, in a bid protest action, section 1491(b)(4) does not automatically require a court to set aside an arbitrary, capricious, or otherwise unlawful contract award."). There would be significant harm to the Government and to the 14 million Americans waiting to get broadband access, which is unlikely before the billions of dollars of funding is released after the completion of this contract. Finally, LightBox inexplicably waited seven weeks to bring its protest after losing at the GAO, weighing strongly against injunctive relief. *C&E Servs., Inc. v. United States*, 160 Fed. Cl. 182, 191 (2022) (citations omitted); ECF No. 34 at 47 (collecting cases). Indeed, "[t]his court has repeatedly held that a protestor's delay in bringing a protest must be accounted for in the balance of hardships inquiry." *Team Waste Gulf Coast, LLC v. United States*, 135 Fed. Cl. 683, 693 (2018); *Elmendorf Support Servs. Joint Venture v. United States*, 105 Fed. Cl. 203, 210 (2012) ("Equity aids the vigilant, not those who slumber on their rights"); *Bannum, Inc.*, 60 Fed. Cl. at 731 ("a bid protest pressed well into contract performance tips the scale [weighing injunctive relief factors] in favor of the awardee"). As a result of the delay, CostQuest provided the beta and production versions of the Fabric before this Court even heard argument. ECF No. 34 at 48-49. And the broadband providers will provide their feedback in the next few days. ECF No. 34-1 at 1. Considering the significant harm and disruption to the FCC and those waiting for broadband access, an injunction this late into performance would be inappropriate even if LightBox prevailed on the merits.

1. Denies LightBox's motion for judgment on the administrative record, ECF No. 26;

2. Grants in part and denies in part the United States' motion to dismiss and cross-motion for judgment on the administrative record, ECF No. 33. The motion is denied insofar as it seeks dismissal and granted insofar as it seeks judgment on the administrative record;

3. Grants in part and denies in part the CostQuest's motion to dismiss and cross-motion for judgment on the administrative record, ECF No. 34. The motion is denied insofar as it seeks dismissal and granted insofar as it seeks judgment on the administrative record; and

4. Directs the Clerk's Office to enter judgment accordingly.

IT IS SO ORDERED.

s/ Edward H. Meyers
Edward H. Meyers
Judge